TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00506-CV






Jeff L. Love a/k/a J. L. Love and Daniel L. Welch, Appellants



v.



State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT


NO. 92-01442, HONORABLE PETE LOWRY, JUDGE PRESIDING 







 The State of Texas brought an action in district court to enforce a final order issued
by the Railroad Commission assessing administrative penalties against Sopresa Petroleum, Inc.
for failure to plug inactive wells in violation of the Texas Natural Resources Code. Additionally,
the State sued to recover civil penalties, plugging costs, and attorney's fees. The State also sought
to hold Jeff Love (a/k/a J. L. Love) and Daniel Welch individually liable for Sopresa's debts
under alternative theories of liability including "piercing the corporate veil." The district court
rendered judgment on the jury verdict in favor of the State. We will affirm the district-court
judgment.


FACTUAL AND PROCEDURAL BACKGROUND

 At all relevant times, Sopresa was the registered operator of two oil and gas
leases--the Klein lease and the VIM lease. The company was incorporated in 1981 by Welch; its
directors and shareholders were Welch, Love, and Alan Murphy. Shortly after incorporation,
Murphy resigned from the board and sold his shares to Love and Welch who remained the sole
shareholders and directors until Sopresa was allegedly sold in December 1986. Love was the
company president, Welch was the secretary and treasurer, and Pat Welch, Dan Welch's father,
was the vice-president. Operators of oil and gas wells are required to maintain current addresses
with the Commission on a P-5 form. 16 Tex. Admin. Code § 3.1(a) (1997). The record reveals
that Sopresa filed the required P-5 form with the Commission in 1984, 1985, and 1986. All three
years the address of the company and officers (Love and both Welches) is listed as: P.O. Box
2086, Temple, Texas. Neither Sopresa nor any officer has ever filed an amended P-5 form
indicating a change in its officers or address.

 There is no dispute that Sopresa Petroleum, the operator of the Klein and VIM
leases, had failed to properly plug abandoned oil wells and was therefore liable under the Texas
Natural Resource Code. See Tex. Nat. Res. Code Ann. title 3, subtitle B, ch. 89 (West 1993 &
Supp. 1998). Although it is not clear, the evidence reveals that both or at least one well may have
been inactive since 1982. Undoubtedly, some violations were apparent as early as 1984: a letter
from the Commission dated January 27, 1984 and addressed to Sopresa and Love at P.O. Box
2086 states that the Klein well was in violation of certain Commission rules. The record is blank
until March 28, 1986, when the Commission again inspected the Klein lease and found that it was
abandoned and "inactive for a long period of time." On April 1, the Commission sent notice to
Sopresa and its officers informing them of the violation. Subsequent inspections in May and June
revealed the Klein lease remained in noncompliance; on October 15, the Commission sent Sopresa
a letter indicating the matter would be referred to the agency's legal department. 

 Regarding the VIM lease, the record appears incomplete. On October 13, 1986,
the Commission sent a similar notification letter to Sopresa and its officers indicating the lease was
in violation of rules and statutes. Inspections on November 13 and December 12 revealed the
same. The violations listed for the VIM lease were similar to the Klein lease: abandoned oil
well, oil spills, and pollution. All notices and letters regarding the VIM lease and the Klein lease
were sent to P.O. Box 2086 in Temple, the address listed on the most recent P-5 form filed in
December 1986.

 On December 11, 1986, Sopresa sold a different lease, the Ogden lease, to a
company called Calidad Petroleum. Calidad is wholly owned and operated by Love and Welch. 
Expert testimony revealed at trial that the Ogden well was producing oil and gas in marketable
quantities. Just three days after transferring the Ogden lease from Sopresa to Calidad, Love and
Welch allegedly sold Sopresa to Luis Ybarra, a Mexican national. The contract reveals that
Ybarra paid $1000 for the company, the main assets of which were the Klein and the VIM leases. 
Love testified that in addition to the two leases, Ybarra received equipment left at the site to cover
the cost of plugging the wells, in the event Ybarra was unable to obtain a permit to use the leases
as salt-water injection or disposal wells. However, photos of the two wells taken in June and
December 1986 fail to reveal the purported site equipment. 

 Only a few months after the sale, the Commission received a letter from Love
indicating that he and Welch were no longer shareholders, officers, or directors, that Pat Welch
had resigned as well, and that the new owner was Luis Ybarra. (1) The letter listed an Arizona
address for Ybarra. The next event did not occur until March 16, 1988, when the Commission
sent Sopresa a formal notice of a hearing regarding the violations on the VIM lease. Days later,
Love filed with the secretary of state his resignation as the registered agent of Sopresa. The
Commission sent Sopresa a formal notice of a hearing regarding the Klein lease in August 1992.

 The Commission's final orders assessing administrative penalties against Sopresa
for violations on the VIM and Klein leases were not issued until August 1988 and June 1993,
respectively. The wells were eventually plugged by the State in October 1991 and March 1993. 
In 1996 the State sued Sopresa, and Love and Welch individually, for administrative penalties,
civil penalties, reimbursement for plugging expenses, and attorney's fees. The petition alleged
appellants were liable as officers and directors for the debts of Sopresa because it failed to file a
franchise tax report. See Tex. Tax Code Ann. § 171.255 (West 1992). The State also alleged
as alternative theories of liability that Love and Welch were the alter-egos of Sopresa and that they
had used the corporation as a sham to perpetrate a fraud. The jury found that both Love and
Welch had used the corporation as a sham to perpetrate a fraud on the Commission. The district
court entered judgment on the verdict in favor of the State, ordering Love and Welch to pay
administrative penalties, civil penalties, expenses for plugging, and attorney's fees. Love and
Welch now appeal, complaining that: (1) the jury's findings were in fatal conflict; (2) the trial
court erred in submitting a jury issue on "alter-ego" and "sham to perpetrate a fraud" because
there was no evidence that appellants were shareholders of Sopresa or that they committed actual
fraud; (3) the trial court erred by not granting a directed verdict to appellants after the State's case
in chief; and (4) there was insufficient evidence that Love was the alter-ego of Sopresa and that
appellants used the corporation as a sham to perpetrate a fraud.


DISCUSSION

Fatal Conflict

 The State sought to hold Love and Welch liable for all of Sopresa's liabilities under
three alternative theories: (1) failure to file franchise tax report; (2) alter-ego; and (3) sham to
perpetrate a fraud. The jury failed to find that Love and Welch were shareholders, officers, and
directors of Sopresa on the dates the final orders were issued or the wells plugged; therefore,
Love and Welch could not be liable under the Tax Code. See Tex. Tax Code Ann. § 171.255. 
The jury, however, did find that Love had been the alter-ego of Sopresa and that both Love and
Welch had used the company as a sham to perpetrate a fraud. 

 Appellants claim the jury's failure to find that appellants were shareholders,
officers, and directors on the specific dates of the final orders and the well-pluggings fatally
conflicts with the jury's affirmative finding that appellants used Sopresa as a sham to perpetrate
a fraud and that Love was its alter-ego. In reviewing jury findings for conflict, the threshold
question is whether the findings are about the same material fact. Bender v. Southern Pac.
Transp. Co., 600 S.W.2d 257, 260 (Tex. 1980). A court may not strike down jury answers on
the ground of conflict if there is any reasonable basis upon which they can be reconciled. Id. We
hold the jury's finding that appellants used Sopresa as a sham to perpetrate a fraud does not
conflict with the jury's failure to find appellants were shareholders, officers, or directors on
certain dates. (2) 

 A "sham to perpetrate a fraud" is a theory of liability distinct from liability under
the Tax Code. A party is free to plead alternative claims for relief. Tex. R. Civ. P. 48.
Furthermore, appellants cite no case to support their theory that an individual must be a
shareholder, officer, or director in order for that individual to be liable under the sham theory. 
 Indeed we find several cases in which an individual has been held liable under the sham theory
long after the corporation in which the individual had some prior interest is dissolved, bankrupt,
or sold. See, e.g., Huff v. Harell, 941 S.W.2d 230, 234 (Tex. App.--Corpus Christi 1996, writ
denied); Seaside Indus., Inc. v. Cooper, 766 S.W.2d 566, 569-70 (Tex. App.--Dallas 1989, no
writ). Thus, shareholder status of the individual at the time liability is assessed or at the time the
Commission's orders became final is not a prerequisite to liability under the sham to perpetrate
a fraud theory. (3) The two findings of which appellants complain are not about the same material
fact and are easily reconciled. We overrule appellants' first issue.


Shareholder Status & Actual Fraud

 Appellants complain that the trial court erred in submitting a jury issue on sham
to perpetrate a fraud because there was no evidence that Love and Welch were shareholders or
that they committed actual fraud. (4) As we have noted, Texas law does not require an individual
to be a shareholder at the time liability is assessed if there has been a sham to perpetrate a fraud. 
See, e.g., Huff, 941 S.W.2d 230; Seaside Indus., Inc., 766 S.W.2d 566. As is often the case,
the corporation will have been dissolved, declared bankrupt, or sold by the time the case is tried
and liability assessed against the individual. Id. In this case, there is no dispute that Love and
Welch were shareholders, officers, and directors at least until December 14, 1986. They cannot
escape liability merely because they were no longer in those positions when the wells were
plugged or the final orders entered. We overrule issue four.

 Appellants additionally claim the State was required to obtain a finding that they
committed actual fraud in order to support its sham theory as required by article 2.21 of the Texas
Business Corporation Act. See Tex. Bus. Corp. Act Ann. art. 2.21 (West 1980 & Supp. 1998) 
The Act states:


A holder of share, an owner of any beneficial interest in shares, . . . or any
affiliate thereof or of the corporation shall be under no obligation to the
corporation or to its obligees with respect to:


 any contractual obligation of the corporation or any matter relating to or
arising from the obligation on the basis that the holder, owner, subscriber, or
affiliate is or was the alter ego of the corporation, or on the basis of actual fraud
or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless
the obligee demonstrates that the holder . . . did perpetrate an actual fraud on the
obligee . . . .



Id. (emphasis added). The Act itself makes clear that actual fraud is required only in the context
of contractual obligations. Comments to article 2.21 confirm this by stating that in response to
Castleberry v. Branscum, which concluded that constructive fraud was a sufficient basis to pierce
the corporate veil, article 2.21 of the Act was amended in 1989 to establish a clear legislative
standard under which the liability of a shareholder is to be determined for contractual obligations. 
Comments of the Bar Committee-1996, art. 2.21 (West Supp. 1998) (citing Castleberry, 721
S.W.2d 270, 272-73 (Tex. 1986)). Finally, the court in Crum & Forster, Inc. v. Monsanto Co.
specifically held that the 1989 amendment to the Act does not preclude liability based upon
something other than a contractual obligation. 887 S.W.2d 103, 146 (Tex. App.--Texarkana 1994,
no writ); see also Sims v. Western Waste Indus., 918 S.W.2d 682, 684 (Tex. App.--Beaumont
1996, writ denied) (Castleberry overruled to extent constructive fraud is no longer sufficient basis
for contractual obligations). Here, the State seeks recovery for violations of rules relating to the
prevention and control of pollution and for reimbursement of plugging expenses. This Court has
recognized that debts arising from circumstances such as these are fundamentally different from
contractual obligations. Serna v. State, 877 S.W.2d 516, 519 (Tex. App.--Austin 1994, writ
denied) (when operator failed to comply with Commission safety rules and was assessed
administrative and civil penalties, debts incurred were caused by failure to take actions statutorily
required and administratively ordered). We hold that Sopresa's liabilities for administrative and
civil penalties, plugging costs, and attorney's fees are not obligations of a contractual nature;
therefore, a finding of actual fraud was not required in order to support a finding that appellants
used the corporation as a sham to perpetrate a fraud. We overrule issue five.


Insufficiency of the Evidence

 Appellants make a general challenge to the jury-charge submission on the issue of
sham to perpetrate a fraud on the grounds of no evidence. Appellants essentially restate their
challenge to this same issue by also complaining that the trial court denied their motion for
directed verdict and that the evidence was legally insufficient to support the jury's finding. An
appeal from the denial of a motion for directed verdict and a challenge to the submission of an
issue are the same as a challenge to the legal sufficiency of the evidence to support the jury's
affirmative finding. See Weirich v. Weirich, 833 S.W.2d 942, 945 (Tex. 1992); Kershner v. State
Bar of Tex., 879 S.W.2d 343, 346 (Tex. App.--Houston [14th Dist.] 1994, writ denied) (appeal
from denial of motion for directed verdict is challenge to legal sufficiency of evidence). In
reviewing a "no evidence" point, either in the context of evidence in support of a jury finding or
proper submission of a jury question, we consider only the evidence and inferences that tend to
support the finding and disregard all evidence and inferences to the contrary. See Burroughs
Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995); Best v. Ryan Auto Group, Inc., 786
S.W.2d 670, 671 (Tex. 1990). If there is more than a scintilla of probative evidence to support
the finding, a no evidence challenge fails. Stafford v. Stafford, 726 S.W.2d 14, 16 (Tex. 1987);
Mai v. Mai, 853 S.W.2d 615, 618 (Tex. App.--Houston [1st Dist.] 1993, writ denied). 

 Appellants also challenge the factual sufficiency of the evidence to support the
finding that Love and Welch used Sopresa as a sham to perpetrate a fraud. When reviewing a jury
verdict to determine the factual sufficiency of the evidence, we must consider and weigh all the
evidence and should set aside the judgment only if it is so contrary to the overwhelming weight
of the evidence as to be clearly wrong and unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex.
1986); In re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951); see also Pool v. Ford Motor Co.,
715 S.W.2d 629 (Tex. 1986); see generally William Powers, Jr. & Jack Ratliff, Another Look at
"No Evidence" and "Insufficient Evidence," 69 Tex. L. Rev. 515 (1991). In these circumstances,
were we to find the evidence is factually sufficient to support the finding a no-evidence review
would be unnecessary.

 The Texas Supreme Court has held that the corporate fiction will be disregarded
"when the corporate form has been used as part of a basically unfair device to achieve an
inequitable result." Castleberry, 721 S.W.2d at 271; see Matthews Const. Co., Inc. v. Rosen,
796 S.W.2d 692, 693 (Tex. 1990) ("when the corporate form is used as an essentially unfair
device--when it is used as a sham--courts may act in equity and disregard the usual rules . . . ."). 
The corporate fiction will be disregarded to prevent the use of the corporate entity as a cloak for
fraud or illegality or to work an injustice. Sims, 918 S.W.2d at 684 (quoting Castleberry, 721
S.W.2d at 273). The courts of appeals have similarly recognized the corporate form is to be
disregarded when the corporation is used to avoid a legal obligation, is used against public policy,
or is used to perpetrate a fraud. See id. (citing Valley Mechanical Contractors, Inc. v. Gonzales,
894 S.W.2d 832, 834 (Tex. App.--Corpus Christi 1995, no writ); Crum & Forster, Inc., 887
S.W.2d at 147-48; Eastwood Model Market v. State, 359 S.W.2d 294, 296 (Tex. Civ.
App.--Austin 1962), aff'd, 365 S.W.2d 781 (Tex. 1963)).

 In Castleberry the supreme court held:


To determine if there is an abuse of the corporate privilege, courts must look
through the form of complex transaction to the substance. The variety of shams
is infinite, but many fit this case's pattern: a closely held corporation owes
unwanted obligations; it siphons off corporate revenues, sells off much of the
corporate assets, or does other acts to hinder the on-going business and its ability
to pay off its debts; a new business then starts up that is basically a continuation
of the old business with many of the same shareholders, officers and directors.




Castleberry, 721 S.W.2d at 275. The evidence of the case before us fits this framework. The
State presented evidence that both the VIM and Klein leases may have been inactive as early as
1982. At the very least, the Commission recorded serious pollution violations in early 1986; in
April and November the agency sent notice to Sopresa informing it of certain violations. The
record reveals that the two notices, as well as a letter referring the matter to the legal department,
were sent to the address listed on the 1985 and 1986 P-5 forms. Both P-5 forms listed the Temple
post office box address for Sopresa, and Love and Welch; this form has never been amended. 
Most notable is the evidence that Love and Welch, on behalf of Sopresa, transferred to their other
company, Calidad, Sopresa's most valuable asset, the Ogden lease, shortly after the Commission
sent notice of the violations and just days before they allegedly sold Sopresa to Ybarra. 
Appellants contend they had no knowledge of the violations until 1988; they also claim that not
until 1992 were they aware of the Commission's action to plug the wells. However, Love sent
a letter to the Commission only four months after the sale in 1986, acknowledging the
Commission's notices and informing the Commission of the change in ownership. Furthermore,
Love stated that Pat Welch had also resigned from office; however, Dan Welch testified that Pat
Welch had been the motivating force in the whole deal; Pat Welch had the ideas, had the oil and
gas knowledge, and would run the operation because Ybarra was merely an investor. 

 Appellants also testified that the two leases were sold together for $1000 and on-site
equipment; however, photographs taken in June and December 1986 reveal none of the purported
equipment on either lease. Welch testified the company was sold for cash but could not recall
where the money went. Neither Love nor Welch could produce documents they referred to as
attesting to their resignation from Sopresa after it was sold. The jury could have reasonably
concluded that appellants were not credible witnesses and that both Love and Welch were well
aware of the violations on the leases before they transferred the valuable Ogden lease to their
other closely-held corporation and then allegedly sold the stripped Sopresa corporation to Ybarra. 


 The record reveals evidence that the Commission was never able to locate Ybarra
at the Arizona address supplied by Love. In an attempt to refute the Commission's implication
that Luis Ybarra never existed, appellants produced a receipt from the secretary of state for a
corporate form paid for by Luis Ybarra. The receipt shows that in January 1988 Ybarra requested
that a "resignation of registered agent" form be sent to Love. Love did not officially resign as
Sopresa's registered agent until March 1988. Although the record contains some conflicting
testimony, a jury is free to believe or disbelieve all or any part of the evidence in making its
findings. See McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986).

 Appellants contend that they cannot be held liable for debts of a corporation that
were created after their sale of and resignation from the corporation. However, the legal
obligations underlying these debts arose prior to the purported sale and appellants' purported
resignations. The Commission had notified appellants that their wells were in violation of the
law. The jury could have reasonably concluded that any sale of the corporation was part of a
sham to perpetrate a fraud upon the Commission by selling a company with thousands of dollars
of potential liabilities in penalties and very few assets. On the other hand, the jury may have 
believed appellants' testimony that they were not aware of the violations until 1988 because they
had not been out to the oil-well sites for several years. This irresponsibility and neglect of a
potential environmental hazard may have led the jury to find Love and Welch ignored their
statutory obligations because they thought they could hide behind the corporate veil. Either way,
there is sufficient evidence for the jury to have concluded that Love and Welch manipulated
Sopresa's corporate form to escape their statutory obligations, and that this was against public
policy, making it necessary to pierce its corporate shell to prevent an injustice. 

 There are several Texas cases with similar circumstances; courts have consistently
pierced the corporate veil when the pattern of the sham is such that shareholders of a corporation
with unwanted obligations siphon off revenues and sell assets, or do other acts to hinder the
company's ability to pay its debts, such as start up a new business with the same shareholders. 
E.g., Castleberry, 721 S.W.2d at 274-75; Klein v. Sporting Goods, Inc., 772 S.W.2d 173, 176-77
(Tex. App.--Houston [14th Dist.] 1989, writ denied) (sole shareholder liable for company debts
when he incorporated new business to continue business of foreclosed company; foreclosure sale
was merely attempt to avoid creditors); Donovan v. Rankin, 768 S.W.2d 443, 444 (Tex.
App.--Houston [1st Dist.] 1989, writ denied) (wife and husband shareholders liable for attempting
to dissolve corporation only to start up same business in new name to avoid judgment); Seaside
Indus., 766 S.W.2d at 568-69 (sole shareholder of company subject to unfavorable judgment
dissolved company to incorporate new company; in addition to same owner and president, new
company had same location, personnel, and telephone number as defunct business); Speed v.
Eluma Int'l, Inc., 757 S.W.2d 794, 797-98 (Tex. App.--Dallas 1988, writ denied) (individuals
liable when shareholder and former shareholder set up scam involving a foreclosure-sale
transaction in which the shareholder sold the bankrupt company's assets to the former
shareholder's viable company in foreclosure action).

 Because the evidence is both legally and factually sufficient to support the jury
verdict, we overrule appellants' claims two, three, seven, and nine. As the verdict can be
sustained on the finding that appellants used the corporation as a sham to perpetrate fraud on the
Commission, we do not reach claims six and eight.


CONCLUSION

 We hold the jury's findings were not in fatal conflict, that the district court did not
err in submitting the sham theory to the jury because shareholder status on certain dates and actual
fraud is not required, and that the evidence was legally and factually sufficient to support the jury
verdict. Therefore, we affirm the judgment of the district court.



 


 Bea Ann Smith, Justice

Before Justices Powers, Kidd and B. A. Smith

Affirmed

Filed: June 18, 1998

Publish
1. The sales agreement stated that Pat Welch would remain an officer of Sopresa after the sale.
2. We need not decide whether the failure to find conflicts with the jury's finding that Love was
the alter-ego of Sopresa because the jury found that appellants had used Sopresa as a sham to
perpetrate a fraud, which is a separate basis upon which to uphold the judgment.
3. But see Stewart & Stevenson v. Serv-Tech, Inc., 879 S.W.2d 89, 108 (Tex. App.--Houston
[14th Dist.] 1994, writ denied) (if basis for disregarding corporate fiction is alter ego it is
necessary that there be some financial interest, ownership, or control by individual sought to be
held liable for tort of corporation).
4. Again, because the judgment may be upheld on the jury's affirmative finding to the sham issue,
we need not address whether the court erred in submitting the alter-ego issue to the jury or whether
there was insufficient evidence to support that finding. See Speed v. Eluma Int'l., Inc., 757 S.W.2d
794, 796 (Tex. App.--Dallas 1988, writ denied).



ve led the jury to find Love and Welch ignored their
statutory obligations because they thought they could hide behind the corporate veil. Either way,
there is sufficient evidence for the jury to have concluded that Love and Welch manipulated
Sopresa's corporate form to escape their statutory obligations, and that this was against public
policy, making it necessary to pierce its corporate shell to prevent an injustice. 

 There are several Texas cases with similar circumstances; courts have consistently
pierced the corporate veil when the pattern of the sham is such that shareholders of a corporation
with unwanted obligations siphon off revenues and sell assets, or do other acts to hinder the
company's ability to pay its debts, such as start up a new business with the same shareholders. 
E.g., Castleberry, 721 S.W.2d at 274-75; Klein v. Sporting Goods, Inc., 772 S.W.2d 173, 176-77
(Tex. App.--Houston [14th Dist.] 1989, writ denied) (sole shareholder liable for company debts
when he incorporated new business to continue business of foreclosed company; foreclosure sale
was merely attempt to avoid creditors); Donovan v. Rankin, 768 S.W.2d 443, 444 (Tex.
App.--Houston [1st Dist.] 1989, writ denied) (wife and husband shareholders liable for attempting
to dissolve corporation only to start up same business in new name to avoid judgment); Seaside
Indus., 766 S.W.2d at 568-69 (sole shareholder of company subject to unfavorable judgment
dissolved company to incorporate new company; in addition to same owner and president, new
company had same location, personnel, and telephone number as defunct business); Speed v.
Eluma Int'l, Inc., 757 S.W.2d 794, 797-98 (Tex. App.--Dallas 1988, writ denied) (individuals
liable when shareholder and former shareholder set up scam involving a foreclosure-sale
transaction in which the shareholder sold the bankrupt company's assets to the former
shareholder's viable company in foreclosure action).

 Because the evidence is both legally and factually sufficient to support the jury
verdict, we overrule appellants' claims two, three, seven, and nine. As the verdict can be
sustained on the finding that appellants used the corporation as a sham to perpetrate fraud on the
Commission, we do not reach claims six and eight.


CONCLUSION

 We hold the jury's findings were not in fatal conflict, that the district court did not
err in submitting the sham theory to the jury because shareholder status on certain dates and actual
fraud is not required, and that the evidence was legally and factually sufficient to support the jury
verdict. Therefore, we affirm the judgment of the district court.



 


 Bea Ann Smith, Justice

Before Justices Powers, Kidd and B. A. Smith

Affirmed

Filed: June 18, 1998

Publish
1. The sales agreement stated that Pat Welch would remain an officer of Sopresa after the sale.
2. We need not decide whether the failure to find conflicts with the jury's finding that Love was
the alter-ego of Sopresa because the jury f